No. 20-712C
(Senior Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SNJEZANA COYNER,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

<div style="margin-left: 45%;">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

ELIZABETH HOSFORD
Assistant Director

</div>

OF COUNSEL:

Robert C. "Rob" Burlison III, Esq.
Senior Trial Attorney
Department of Veterans Affairs
Continental District
(AR, CO, LA, MS, MT, OK, TX, UT, WY)
P.O. Box 25126
Denver, CO 80225
Tel: (202) 674-2212

August 17, 2022

REBECCA S. KRUSER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2035
rebecca.s.kruser@usdoj.gov

Attorneys for Defendant

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ................................................................................................ iii

TABLE OF AUTHORITIES ........................................................................................ iv

I.   Reply To Ms. Coyner's "Statement Of Disputed And Undisputed Material Facts" ..1

    A.   Ms. Coyner's Response To Our Statement Of Undisputed Facts No. 15-16 Does Not Present Any Reason For The Court To Deny Summary Judgment .................................................................................2

        1.   Ms. Coyner's Description Of Ms. Bruner's Testimony Is Incorrect ..........................................................................2

        2.   Testimony Demonstrates Irrefutably That Ms. Coyner Was Directed Not To Work Extra Hours .............................................2

        3.   Ms. Coyner's Unsupported Characterizations Do Not Alter The Record Testimony.....................................................7

        4.   The Document Cited By Ms. Coyner Does Not Support Her Argument .......................................................................9

        5.   Ms. Coyner's Reference To Her Earlier Supervisors Is Irrelevant ......................................................................10

    B.   Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 17 Do Not Present Genuine Issues Of Material Fact ...................11

    C.   Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 18 Do Not Present Genuine Issues Of Material Fact ...................12

    D.   Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 19 Do Not Present Genuine Issues Of Material Fact ...................12

    E.   Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 20 Do Not Present Genuine Issues Of Material Fact ...................13

II.   Reply To Plaintiff's "Additional Material Facts" ....................................................13

III.   Ms. Coyner's Contention That She Is Entitled To Overtime Because Her Credit Hours Were "Marked Improperly" And She Worked Involuntarily Is Contrary To Statute And Case Law ....................................................................................18

  A.   Ms. Coyner Does Not Correctly Apply This Court's Cases ........................19

  B.   Ms. Coyner's Arguments About Voluntary Credit Hours Are Contrary To Statute And Case Law ..............................................................................21

IV.   Ms. Coyner Incorrectly Contends That Overtime Is Induced Pursuant To 38 U.S.C. § 7453(e) When An Employee Is "Knowingly" Placed In A Position With Duties That Cannot Be Completed Without Working Extra Hours ...............25

  A.   The Cases Ms. Coyner Relies Upon Are Distinguishable ..........................26

  B.   Ms. Coyner Ignores Key Precedent Defining Inducement ..........................31

  C.   Ms. Coyner's Suggested Knowledge Test Would Not Apply Here ............32

  CONCLUSION .............................................................................................................34

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Abbey v. United States*,
    99 Fed. Cl. 430 (2011) ............................................................................5

*Abbey v. United States*,
    124 Fed. Cl. 397 (2015) .........................................................19, 20, 24

*Abbott v. United States*,
    No. 317-71, 1980 U.S. Ct. Cl. LEXIS 1006 (Ct. Cl. May 30, 1980).....................30

*Albright v. United States*,
    161 Ct. Cl. 356 (1963) ..........................................................................32

*Am. Contractors Indem. Co. v. United States*,
    111 Fed. Cl. 240 (2013) ..........................................................................5

*Am. Contractors Indem. Co. v. United States*,
    557 F. App'x 979 (Fed. Cir. 2014) ........................................................5

*Anderson v. United States*,
    136 Ct. Cl. 365 (1956) .........................................................25, 26, 28

*Bantom v. United States*,
    165 Ct. Cl. 312 (1964) ..........................................................................32

*Baylor v. United States*,
    198 Ct. Cl. 331 (1972) ..........................................................................32

*Biletto v. United States*,
    174 Ct. Cl. 1253 (1966) ....................................................................9, 31

*Doe v. United States*,
    513 F.3d 1348 (Fed. Cir. 2008)..........................................................24

*Grand Acadian Inc. v. United States*,
    87 Fed. Cl. 193 (2009) ..........................................................................5

*Manning v. United States*,
    10 Ct. Cl. 651 (1986) ....................................................................28, 29

*Mercier v. United States*,
    114 Fed. Cl. 795 (2014) ..........................................................................31

*Mercier v. United States*,
    786 F.3d 971 (2015) .................................................................................4, 31

*Whalen v. United States*,
    93 Fed. Cl. 579 (2010) ....................................................................................24

## FEDERAL STATUTES

5 U.S.C. § 5542(a) .................................................................................................19

5 U.S.C. §§ 6120-6133 ...........................................................................................18

5 U.S.C. § 6121(4) ............................................................................................21, 22

5 U.S.C. § 6121(6) ............................................................................................22, 24

5 U.S.C. § 6122(a)(2) ..................................................................................18, 21, 24

5 U.S.C. § 6123(a)(1) .............................................................................................19

5 U.S.C. § 6123(b) ...........................................................................................19, 20

5 U.S.C. § 6126 ................................................................................................20, 24

38 U.S.C. § 7453(e) ............................................1, 4, 6, 16, 19, 20, 22, 25, 33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SNJEZANA COYNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 20-712C |
| | )   (Senior Judge Eric Bruggink) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, the United States, respectfully submits this reply in support of its motion for summary judgment (ECF No. 32).  In our motion, we demonstrated that plaintiff, Snjezana Coyner, is (1) not entitled as a matter of law to overtime for credit hours that she accumulated; and (2) there is no genuine issue of material fact that management did not "order or approve" Ms. Coyner's excess work hours for purposes of 38 U.S.C. § 7453(e).  Ms. Coyner's opposition, while presenting at length her subjective opinions about her job duties and relationship with her supervisors, does not provide any reason, legal or factual, to deny our motion.  The opposition is based on unsupported characterizations of the record and misunderstandings of the law.  The Government is entitled to summary judgment.

## I.    Reply To Ms. Coyner's "Statement Of Disputed And Undisputed Material Facts"

The first section of Ms. Coyner's opposition presents a flurry of undifferentiated legal conclusions and asserted factual statements and characterizations, some organized numerically, but mostly in stream of consciousness-style paragraphs. Pl. Opp'n at 5-14.  Ms. Coyner also makes a variety of factual arguments in the last three pages of her opposition, which generally, but not identically, reiterate statements made in the first seventeen pages of her opposition.  *Id.* at 29-34.  We will not repeat our reply to these separate factual statements if they are reasonably

1

covered by our reply to Ms. Coyner's first fact section.[1]

**A.**   **Ms. Coyner's Response To Our Statement of Undisputed Facts No. 15-16 Does Not Present Any Reason For The Court To Deny Summary Judgment**

1.   Ms. Coyner's Description of Ms. Bruner's Testimony Is Incorrect

Ms. Coyner asserts that Ms. Bruner "testified that she approved all of Plaintiff's credit hours because Plaintiff was required to work the extra hours."  Pl. Opp'n at 6.  This is incorrect. Ms. Bruner testified to the opposite – she stated that Ms. Coyner *was not* required to work credit hours beyond her standard 40 hours a week.  Ms. Bruner also indicated that it was Ms. Coyner who would decide when she was going to work credit hours.  SAppx30-32.

2.   Testimony Demonstrates Irrefutably That Ms. Coyner Was Directed Not To Work Extra Hours

Ms. Coyner attempts to contest the clear testimony, both from herself and from Ms. Bruner, that when Ms. Coyner raised concerns to Ms. Bruner about the hours she felt she needed to work, she received a "standard answer" from Ms. Bruner of "just don't work," that Ms. Bruner directed Ms. Coyner verbally and in emails to stop working once she reached 24 credit hours in a pay period, and that Ms. Bruner testified that she told Ms. Coyner, "you need to stop working these extra hours and that can be done by delegating."  Appx109-113, Appx129, Appx71.

Ms. Coyner now claims, relying on a new affidavit, that there "were many times where she had already accrued 24 credit hours, and communicated such to her superiors, and yet she was still given assignments that were scheduled outside of her regular hours" or that she was given work that was "inherently impossible to complete without her working extra hours,"

---

[1]   Ms. Coyner also chose not to provide appendix numbering for her exhibits.  To avoid confusion, we have created a supplemental appendix for this reply, which includes documents cited by Ms. Coyner in her opposition.  Citations to the appendix included with our motion are Appx and citations to the supplemental appendix are SAppx.

although her supervisors knew she had already accrued 24 credit hours.  Pl. Opp'n at 6; SAppx2-3.

There is a major problem with this argument, which is pervasive throughout Ms. Coyner's opposition.  Ms. Coyner presents absolutely no evidence that her supervisors *agreed* that any task was "inherently impossible to complete" without working beyond the 24 credit hour limit.[2]  Ms. Coyner also does not present any evidence that her supervisors knew at any given time that she would end up being over the 24 credit hour limit at the end of the pay period, given how Ms. Coyner could reduce that balance at any time at her discretion by taking time off with credit hours.  Finally, Ms. Coyner cannot dispute that her supervisors expected her to manage her time when she received new work by prioritizing and delegating.  That *Ms. Coyner* testified her work could not be completed within her basic work requirement, plus accruing credit hours if needed, does not create a disputed fact; her *supervisors* did not testify that she needed to work beyond 40 hours per week or that they "knowingly" assigned her work that "inherently" required her to work more than her credit hour limit.  Indeed, Ms. Coyner's supervisors indisputably testified that she could and should stop working when she reached her 24 credit hour limit and that it was possible to delegate some of her tasks to others because they explicitly testified that they told her to do this.

However, Ms. Coyner simply did not agree with this assessment, pushed back, and continued to work excessively.  *See* Appx124-126.  Much of Ms. Coyner's testimony and her opposition is aimed at attempting to justify why she did not just stop working when told to do so.

---

[2]  Ms. Coyner also generally worked within her tour of duty and did not request many credit hours during her time being supervised by Ms. Lohar and Mr. Schulz, contradicting her conclusory statements that her job "inherently" necessitated working outside of her tour of duty or beyond 24 credit hours per pay period.  *See* Appx3-8, Appx17-24.

*See* Pl. Opp'n 6-8, 31.  It should be obvious that an employee cannot claim inducement and effectively award herself overtime when work is performed contrary to the instruction of her supervisor.[3]  Ms. Coyner's arguments are based on the unsupported idea that she has some right or entitlement to be paid overtime for working as much as she personally felt was necessary, independent of her management.

Ms. Coyner's arguments also run afoul of the sham affidavit rule.  Ms. Coyner relies on an affidavit created for purposes of opposing the summary judgment motion to assert that she was "explicitly ordered" to perform tasks and attend events after she had already communicated that she had reached her 24 credit hour per pay period limit.  SAppx2.  Ms. Coyner also claims in her affidavit that there were "occasions where Ms. Bruner assigned Plaintiff tasks to be taken care of outside of her regular hours, and when Plaintiff communicated to Ms. Bruner that she had already reached 24 credit hours and asked if the tasks could wait, Ms. Bruner told her that the tasks nonetheless needed to be performed immediately (outside of Plaintiff's regular hours)."  Pl. Opp'n at 9; SAppx3-4.  The problem with these so-called facts is that they should be stricken pursuant to the sham affidavit rule.

At her deposition, Ms. Coyner denied that this exact scenario had ever occurred.  Ms. Coyner may not manufacture a factual dispute by creating an affidavit that contradicts her deposition testimony.[4]  "Under the sham affidavit doctrine, a party 'cannot create an issue of fact

---

[3]  Unlike the Fair Labor Standards Act (FLSA), which requires compensation when the employer merely suffers or permits the employee to work overtime, the phrase "ordered or approved" in 38 U.S.C. § 7453(e) is a more limited standard.  *See Mercier v. United States*, 786 F.3d 971, 977 (2015).

[4]  Ms. Coyner's affidavit is also vague on her use of credit hours.  Ms. Coyner states that there were "numerous times" when she was ordered to perform a task like attending a townhall outside of her regular tour of duty.  However, her affidavit suggests that when this happened, she was not always at her 24 credit hour per pay period maximum.  SAppx2-3.  Similarly, Ms.

by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity.'" *Abbey v. United States*, 99 Fed. Cl. 430, 457 (2011) (quoting *Grand Acadian, Inc. v. United States*, 87 Fed. Cl. 193, 206 (2009)); *see also Am. Contractors Indem. Co. v. United States*, 111 Fed. Cl. 240, 251 (2013), *aff'd*, 557 F. App'x 979 (Fed. Cir. 2014). At her deposition, Ms. Coyner testified as follows:

> Q. To your recollection, did you ever have a specific conversation with someone where you said, I am at 24 hours per pay period and they said it doesn't matter, keep working?
>
> A. I don't recall it ever being phrased in that way.

Appx117.

Ms. Coyner's statements in her affidavit are contradicted by this previous clear answer to an unambiguous question and should be stricken. *See Am. Contractors Indem. Co.*, 111 Fed. Cl. at 251. At most, Ms. Coyner testified in her deposition that there was an "expectation" that she attend certain events, that her work needed to get done, and that her leadership made "requests." Appx117-118. This is far less than the contradictory claim of an inflexible work requirement presented in her affidavit.

Indeed, Ms. Bruner's testimony confirms that Ms. Coyner was not, from her supervisor's perspective, required to attend public outreach meetings and townhalls and had the ability to decide not to go and delegate to another person, even if asked by Mr. Kilmer, her second-line

---

Coyner asserts that there were "numerous times" when she was given tasks with deadlines that would necessitate her working outside of her regular hours, but seems to acknowledge that sometimes she was not at her credit hour maximum. *Id.* Therefore, it appears that Ms. Coyner would have earned credit hours for at least some of these incidents. Ms. Coyner could and did reduce her credit hours bank by using her credit hours to shorten her workday or workweek, which would allow her to then accrue more credit hours. Ms. Coyner also does not present any specific times or dates or amount of hours for any of these incidents that would even allow the Court to award overtime if it agreed with Ms. Coyner's legal position.

supervisor and Director of the Western Colorado Healthcare System.  SAppx25-29.  Ms. Bruner

expressly testified that Ms. Coyner was not required to attend such events.  *Id.*  Furthermore,

simply suggesting, without evidence, that Ms. Bruner believed that Ms. Coyner was "required to

work as many extra hours as necessary to complete her duties" does not demonstrate a genuine

issue of material fact.  Pl. Opp'n at 10.

Next, Ms. Coyner asserts that Mr. Schulz and Ms. Bruner testified "that there was no

legal issue with Plaintiff being required to work extra hours – even beyond 24 hours – without

receiving any premium pay to complete her job responsibilities."  *Id.* at 6-7.  First, this claim is

not correct – Mr. Schulz testified that nurses could receive time-and-a-half payment, although he

was unsure how this applied to Ms. Coyner, who was working not in a classic nursing role, but

as a service chief.  SAppx55-57.  Ms. Bruner stated that Ms. Coyner could not be compensated

for any time she worked beyond her 24 credit hour per pay period limit.[5]  SAppx30, SAppx14.

Regardless, Ms. Coyner does not explain how Ms. Bruner's or Mr. Schulz's apparent

unfamiliarity with 38 U.S.C. § 7453(e) creates a factual dispute regarding whether Ms. Bruner

told her to stop working when she reached her 24 credit hour limit.  Nothing in the testimony

cited by Ms. Coyner contradicts that she was repeatedly instructed not to work beyond her credit

hour limitations.  The testimony cited does not suggest, contrary to Ms. Coyner's

characterization, that either individual believed Ms. Coyner *should* work unpaid overtime or

thought there was just no issue if she did so.  Ms. Bruner communicating her understanding that

---

[5]  The documents that Ms. Coyner cites regarding Ms. Bruner's intentions are incomplete.
*See* Pl. Opp'n at 19.  We have included complete versions in our supplemental appendix.  In
particular, the complete version of one email contains another instruction from Ms. Bruner not to
work credit hours because Ms. Coyner's time card had already been entered and another contains
an instruction from the timekeeper that Ms. Coyner should watch the amount of credit hours that
she was working.  SAppx9, SAppx11-12

Ms. Coyner could not receive any premium pay for work beyond the 24 credit hour limit does

not contradict or dilute the instruction to stop working.  If anything, Ms. Bruner statements that

Ms. Coyner would not be paid should have provided further incentive for Ms. Coyner to stop

working.

        3.     Ms. Coyner's Unsupported Characterizations Do Not Alter The Record
             Testimony

Ms. Coyner spends two pages of her brief arguing that the clear direction of "stop

working" in fact meant something totally different.  Pl. Opp'n at 7-8.  This portion of the

opposition is illogical and entirely relies on Ms. Coyner's uncited and unsupported suppositions.

Ms. Coyner plainly testified that when she brought concerns to Ms. Bruner about the hours she

felt she needed to work, she received a "standard answer" from Ms. Bruner of "just don't work."

Appx109-113.

Contrary to Ms. Coyner's argument that this statement could not be understood to refer to

stopping work upon reaching 24 credit hours, Pl. Opp'n at 7, Ms. Coyner testified that she was

told verbally and in emails "don't work over 24 hours" and "you're at your 24 hours. Stop."

Appx112-113, Appx115.  Ms. Coyner further testified that if she made her supervisors aware

that she was working hours beyond the 24 credit hour limit, she received a response of "stop

working."  Appx129.  Ms. Bruner also testified that Ms. Coyner needed to change how she

worked so she did not go over the 24 credit hour limit, Appx68, and that she told Ms. Coyner,

"you need to stop working these extra hours and that can be done by delegating."  Appx71.  Ms.

Coyner cannot create a genuine issue of material fact by conclusorily characterizing this

unambiguous testimony as "disingenuous," as merely a "general recommendation," as not a

"genuine directive," as a "suggestion," or, most bizarrely, as containing some unstated, opposite

meaning.  *See* Pl. Opp'n at 7-8.

That Ms. Coyner argued with Ms. Bruner and refused to follow this direction because she subjectively believed in the "necessity of the extra hours" does not create a genuine issue of material fact about what Ms. Bruner intended. *See id.* at 8. Ms. Bruner did not "concede" that her direction was an impossibility, *id.* at 9, but attempted to address Ms. Coyner continuing to work beyond 24 credit hours per pay period. Any further discussions the parties had were caused by Ms. Coyner refusing to stop work and, in her own terms, pushing back. Appx71-72, Appx124-125. The documents cited by Ms. Coyner do not evince any alternate instruction from Ms. Bruner, but only contain Ms. Coyner's own subjective opinion that she could not comply.[6]

More troublingly, Ms. Coyner's emails demonstrate that she was not even disclosing to Ms. Bruner the actual number of hours that she was working. As of May 24, 2019, almost one year after she started in her position, Ms. Coyner acknowledged that "previously I was not accurately [r]epresenting all the hours I was working." Appx7.[7] It is unclear how she expected Ms. Bruner to solve her problems, or how she can now argue that Ms. Bruner "knowingly" assigned work that "inherently necessitated" extra hours, *see* Pl. Opp'n at 6, when she did not reveal to her supervisor the hours she now claims she was actually working.

---

[6] Ms. Bruner did not testify that "Plaintiff did not have the right to only work regular hours unless she was able to complete her duties within her regular hours." Pl. Opp'n at 8. She also did not testify that Ms. Coyner "was responsible to work beyond her regular hours to complete her job duties." Pl. Opp'n at 8, 9. To the contrary, Ms. Bruner stated that Ms. Coyner was allowed to work her standard, eight-hour tour of duty every day if she wanted to without using credit hours if she could get her work done. SAppx30-32. Thus, Ms. Coyner was not forced to use credit hours. This testimony does not speak to or contradict Ms. Bruner's testimony that she told Ms. Coyner to stop working when she had reached the credit hour maximum.

[7] The version of this document included in Ms. Coyner's exhibits is inexplicably cut off. We have included the full version in our supplemental appendix.

4.      The Document Cited By Ms. Coyner Does Not Support Her
        Argument

Ms. Coyner next asserts, based on emails between Ms. Coyner and Ms. Bruner dated

February 11, 2019, that Ms. Bruner did not intend for Ms. Coyner to stop working once she

reached 24 credit hours.  *Id.* at 9.  These emails do not make it "blatantly clear" that Ms. Bruner

intended for Ms. Coyner keep working once she reached 24 credit hours per pay period.  *See*

SAppx14-15.  In this email chain, Ms. Coyner stated that she knew she could not earn more than

24 credit hours per pay period and indicated that, as discussed above, she had not been reporting

her time.  *Id.*  Ms. Bruner told her to record her time, but that she could not be compensated for

extra hours beyond 24 credit hours per pay period.  *Id.*  Ms. Coyner responded that, "I will get

my time in for the weekend and then when I hit 24, I hit 24 – I will try to use my time as I can,

given the ever changing environment we have."  *Id.*

Given that the "Business Process Rules for Gliding Flexitour Schedule with Credit

Hours" document signed by Ms. Bruner and Ms. Coyner required her to log her credit hours,

Appx1-2, there was nothing untoward about Ms. Bruner telling Ms. Coyner to record her time,

especially in response to Ms. Coyner's comment that she had not been doing so.  Furthermore,

based on Ms. Coyner's final email, it appears that she was not at the 24 credit hour limit, and that

she also intended to use credit hours, which would reduce the amount she had banked.

SAppx14.  Therefore, this document demonstrates that Ms. Bruner may not have been aware that

Ms. Coyner would reach and exceed the 24 credit hour limit by the end of the pay period.  Ms.

Bruner also reminded Ms. Coyner of the 24 credit hour per pay period limit.  *Id.*  Stating that Ms.

Coyner should record her hours worked and could not be compensated for going over the limit

does not contradict any previous instruction that Ms. Coyner should stop working when she

reached 24 credit hours per pay period.[8]  Rather, it reinforces the limitation.

5.  Ms. Coyner's Reference To Her Earlier Supervisors Is Irrelevant

Ms. Coyner next argues that neither Ms. Lohar nor Mr. Schulz directed her not to work extra hours when she was under their supervision.  Pl. Opp'n at 10.  This point is irrelevant because Ms. Coyner's credit hour tracking spreadsheet and the agency's timekeeping system indisputably demonstrate that Ms. Coyner did not accrue more than 24 credit hours per pay period during the timeframe she worked for Ms. Lohar and Mr. Schulz.  Appx3-8, Appx17-24. Further, Mr. Schulz testified that he believed it was possible to complete the duties of overseeing the VA Care in the Community program without working overtime.  Appx155-158.

Ms. Coyner also argues that she informed Mr. Kilmer of her extra hours, and he never directed her not to work beyond the 24 allowable credit hours.  Pl. Opp'n at 10.  This argument is specious.  Separate from Ms. Bruner's repeated directions that Ms. Coyner should stop working, Ms. Coyner's "Business Process Rules for Gliding Flexitour Schedule with Credit Hours" documents informed her that she was accountable for not carrying over more than 24 credit hours into the next pay period.  Appx1-2.  She thus cannot argue that she was somehow relying on Mr. Kilmer to provide instructions.  As Ms. Coyner appears to acknowledge, Pl. Opp'n at 10-11, Mr. Kilmer directed her back to Ms. Bruner when she went to him with concerns about her workload.[9]  Appx115-117.

---

[8]  At most, Ms. Bruner acknowledged that Ms. Coyner had been working more than 24 credit hours per pay period.  However, this does not create a legal entitlement to overtime.  The Court of Claims has held that there is no compensation when the employer only has "mere knowledge" of the overtime.  *Bilello v. United States*, 174 Ct. Cl. 1253, 1257 (1966).

[9]  Ms. Coyner relies on one page of an email chain entitled "Mission Act Impact" to assert that she sent Mr. Kilmer a "gap analysis discussing 70-80 hours work per week to Mr. Kilmer." Pl. Opp'n at 10-11.  However, nothing in the page provided by Ms. Coyner uses the words "gap

**B.     Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 17 Do Not Present Genuine Issues Of Material Fact**

Ms. Coyner spends an inordinate amount of space discussing our Undisputed Fact No. 17 and arguing about a small amount of Ms. Bruner's testimony discussing the performance of Ms. Coyner's successor, Mr. Oleva.  *See* Pl. Opp'n at 11-13.  First, we note that Ms. Bruner flatly testified that Ms. Coyner's tasks did not require her to work overtime, without reference to Mr. Oleva.  Appx75.  However, that Mr. Oleva "never worked more than one credit hour past the 80 hour pay period" tends to show that Ms. Coyner's workload complaints and excessive hours were idiosyncratic to her and were not caused by Ms. Bruner, the nature of the work in general, or by any office policy or environment of inducement.  *See* Appx66-67.

Ms. Coyner's suggestion that Mr. Oleva was not performing some large part of her role or that Ms. Bruner did not know what Mr. Oleva was working on is incorrect.  Pl. Opp'n at 11-12.  Ms. Bruner clearly testified that Mr. Oleva took over all of Ms. Coyner's duties, with the exception of signing off on nurse proficiencies, a task that required, at most, approximately 2 hours per month.  Appx79-84.  When asked whether it was correct that none of Ms. Coyner's replacements had performed all of the duties that she performed, Ms. Bruner responded that that was not correct, and then stated that the "only thing" Mr. Oleva could not do was sign off on nurse proficiencies.  Appx79-80.  As his supervisor, Ms. Bruner clearly had insight into the amount of credit hours Mr. Oleva requested.  Ms. Coyner also only puts forth speculation, without evidentiary support, Pl. Opp'n at 11-13, to suggest that Mr. Oleva was working under different circumstances or with different metrics.[10]

---

analysis" or references 70-80 hours per week.

[10]  Ms. Bruner also testified that as of August 2021, a nurse manager had not been hired, demonstrating that Mr. Oleva also experienced the lack of middle management complained of by

**C.  Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 18
    Do Not Present Genuine Issues Of Material Fact**

Ms. Coyner's objections to Undisputed Fact No. 18 appear to be based solely on

contesting Mr. Kilmer's evaluation of her performance or abilities.[11]  *See* Pl. Opp'n at 13.  Mr.

Kilmer tried to coach Ms. Coyner to "slow down" and "assign and delegate" work to her staff.

Appx139-140.  Mr. Kilmer had concerns about Ms. Coyner's ability to delegate and thought that

she could do a better job delegating.  Appx142-143.  Although Ms. Coyner disagrees with Mr.

Kilmer's testimony, such disagreement does not create a dispute of material fact.  Mr. Kilmer's

testimony that he did make these statements and hold these opinions is undisputed and

demonstrates that he was not inducing Ms. Coyner to work overtime, but instead wanted her to

work less.

**D.  Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 19
    Do Not Present Genuine Issues Of Material Fact**

Mr. Kilmer testified that a "bigger challenge" and a "failure of management" on Ms.

Coyner's part was that she was focused on adding more positions to try to grow her department,

instead of on building her team, managing her team, and filling existing vacancies.  *See* Def.

Mot. at 8; Appx139-141.  Ms. Coyner again disagrees with Mr. Kilmer's assessment and offers

the excuse that there was an outside directive to hire more staff.  Pl. Opp'n at 14.  However,

whether there was such a directive is not a material fact.  Mr. Kilmer's opinion was that Ms.

---

Ms. Coyner.  Appx65.

[11]  Ms. Coyner incorrectly asserts that Mr. Kilmer's testimony that Ms. Bruner had challenges with Ms. Coyner in managing her schedule was "not referring to challenges with Plaintiff working substantial hours."  Pl. Opp'n at 13.  Mr. Kilmer's testimony is best read as stating that Ms. Coyner's failure to attend meetings was a symptom of her general failure to "manage working within her schedule."  Appx136-137.  Indeed, Ms. Coyner attempts to excuse her lack of attendance at meetings by pointing to the "extreme busyness of her schedule."  Pl. Opp'n at 13.

12

Coyner should have focused on filling existing vacancies before asking for new positions. Appx140.  Ms. Coyner's opposition simply demonstrates that she was determined to conduct her work as she saw fit, in a manner inconsistent with her supervisors' expectations.

 **E.** **Ms. Coyner's Arguments Regarding Statement Of Undisputed Fact No. 20 Do Not Present Genuine Issues Of Material Fact**

  Ms. Coyner argues that testimony evidencing that her predecessor, Mr. Schulz, did not need to work overtime does not establish that she was not required to work excess hours.  *Id.* However, this contention misses the mark.  Like Mr. Oleva, that Mr. Schulz was able to oversee the VA Care in the Community program and also hold the position of Chief Financial Officer (CFO) without working overtime, *see* Appx155-158, demonstrates that Ms. Coyner's issues were idiosyncratic to her and were not caused by the nature of the work in general or by any office policy or environment of inducement.  Ms. Coyner's affidavit indicates that she was the one who identified departmental problems and then decided how to fix them.  SAppx1.  There is no evidence that Ms. Coyner's supervisors requested or required the level of effort that she believed was necessary.

**II.** **Reply To Plaintiff's "Additional Material Facts"**

  Although Ms. Coyner has not cross-moved for summary judgment, in addition to arguing that the undisputed facts set forth in our motion should be considered disputed, she also puts forth a separate section of her opposition containing numbered "additional material facts."  *See* Pl. Opp'n at 15-21.  However, these so-called material facts are either legal conclusions, are not correctly stated based on the testimony cited, or are not actually material to the question of whether Ms. Coyner is legally entitled to overtime.  We respond to them in the numerical order created by Ms. Coyner.

  1. We do not dispute that Ms. Coyner was "employed as Associate Chief Nurse of

the VACC at the VA medical center in Grand Junction, Colorado, from June 24, 2018, to August 3, 2019." *See* Pl. Opp'n at 15.

2.      We do not dispute Ms. Lohar's testimony as to why Ms. Coyner was hired, but Ms. Coyner does not support her characterization of the problems as "severe."  These facts do not present a genuine issue with respect to the material fact that Ms. Coyner was not officially ordered or approved to work overtime, including through inducement.

3.      The metrics described by Ms. Coyner are not a material fact as to whether she was officially ordered or approved to work overtime, including through inducement.

4.      These facts support our position that the undisputed evidence demonstrates that Ms. Coyner was not officially ordered or approved to work overtime, including through inducement.  If, as Ms. Coyner claims, none of her supervisors were even aware of the "major issues" she uncovered, they could not have been inducing the work Ms. Coyner decided was necessary to correct these problems.

5.      We do not dispute the specifics of Ms. Coyner's day-to-day tasks, but this does not create a genuine issue with respect to the material fact that Ms. Coyner was not officially ordered or approved, including through inducement, to complete this work using overtime hours.

6.       Same as number 5.

7.      Ms. Coyner does not support her characterization that she was "consistently" given other assignments by the Director's Office or that she was personally required to complete these assignments.  Pl. Opp'n at 16-17; SAppx27-29.  Ms. Bruner also testified that Ms. Coyner would receive congressional inquiries but could decide if she was the best person to respond. SAppx29.  Ms. Coyner also does not present any evidence showing a genuine issue with respect to the material fact that she was officially ordered or approved, including through inducement, to

14

complete this work using overtime hours.

8.      Ms. Coyner does not support her characterization that she was "required to have constant correspondences." Pl. Opp'n at 17.  Instead, Ms. Coyner, as a high-paid and high-ranking senior level management official, was allowed to use a flexible schedule and was expected to manage her own time.  *See* Appx25-26.  Descriptions of Ms. Coyner's work do not present a genuine issue with respect to the material fact that she was not officially ordered or approved, including through inducement, to complete any of these tasks using overtime hours. Furthermore, Ms. Coyner acknowledges that she did not always the attend the meetings that she now claims she was "tasked with attending." *See* Pl. Opp'n at 13; Appx72-73; Appx137-138.

9.      This paragraph contains legal conclusions and unsupported characterizations, not material facts.  Ms. Coyner was on a gliding flexitour schedule that allowed her to earn credit hours by working beyond her tour of duty in one pay period, and use these credit hours as a form of leave to shorten her tour of duty in another pay period without losing pay or being required to use annual leave.  *See* Appx1-2.

10.     This paragraph contains legal conclusions and unsupported characterizations, not material facts.

11.     We do not dispute that Ms. Coyner discussed her workload with her supervisors, but she does not provide any evidence that the "substantial extra work" she alleges was officially ordered or approved, including through inducement.  When Ms. Coyner raised concerns to Ms. Bruner about the hours she felt she needed to work, she received a "standard answer" from Ms. Bruner of "just don't work."  Appx109-113.  Ms. Bruner directed Ms. Coyner "multiple times," both verbally and in emails, to stop working once she reached 24 credit hours in a pay period. *Id.*; Appx71; Appx129.

12.     The document cited by Ms. Coyner is a memorandum from Ms. Coyner to Ms. Lohar dated July 30, 2018 requesting approval for compensatory time or overtime.[12]  SAppx6.  It specifically required an employee to track overtime.  *Id.*  Ms. Coyner testified at her deposition that she did not track any overtime because "overtime never happened, to the best of my recollection."  SAppx52-54.  Ms. Coyner explained that she made Ms. Bruner aware of this document but that Ms. Bruner said that she would not approve Ms. Coyner to earn overtime.  *Id.* Furthermore, Ms. Coyner acknowledged she received compensatory time instead of credit hours for certain days in July 2018, but that she never requested or used any overtime while under Ms. Lohar or Mr. Schulz.  Appx18, Appx120-122.  Therefore, this document was not a *carte blanche* for Ms. Coyner to earn overtime during her entire period of employment "for any extra hours required," as she suggests.  *See* Pl. Opp'n at 18.

13.     Mr. Schulz did not testify that Ms. Coyner could not earn overtime pay.  Mr. Schulz understood that there was a separate rule for nurses.  SAppx55-57.  Mr. Schulz did not at all testify that there was no "legal issue" with Ms. Coyner "having to work extra hours without overtime pay or compensation."  *See* Pl. Opp'n at 18.

14.     Whether Ms. Bruner had a correct legal understanding of 38 U.S.C. § 7453(e) does not refute that she specifically told Ms. Coyner to stop working when she reached 24 credit hours per pay period.  There is no evidence that Ms. Bruner only "initially" told Ms. Coyner to stop working.  *See id.* at 19.  It is apparent that Ms. Coyner believed that it was impossible for her to stop work and was dissatisfied with Ms. Bruner's instruction to "just stop working." Appx112-113.  Ms. Bruner did not "concede[]" that she did not attempt to resolve the issue.  Pl.

---

[12]  The memorandum does not indicate if Ms. Lohar concurred or did not concur with this request.  Ms. Coyner testified that she believed Ms. Lohar concurred.  SAppx52-54.

Opp'n at 19.  Instead, she testified that because Ms. Coyner was a supervisor it was Ms.

Coyner's responsibility to figure out how to delegate and brainstorm the issue.  *See* Appx69-74.

The documents cited by Ms. Coyner only indicate that she was continuing to work as much as

she felt was necessary without even informing Ms. Bruner of all of her hours.  Indeed, the

complete version of one email chain demonstrates that Ms. Bruner offered to attend meetings in

Ms. Coyner's stead.  SAppx21-22.  Finally, the record does not show that Ms. Bruner ever varied

her instruction to stop working or agreed that Ms. Coyner should keep working if Ms. Coyner

believed her job responsibilities required certain work.

15.     Ms. Coyner's claim that she was ordered to attend events outside her regular

hours has been discussed in section I. above and will not be repeated here.

16.     Ms. Coyner does not present any evidence that Ms. Bruner agreed that any

deadline or task "inherently could not be completed without working outside her regular hours."

*See* Pl. Opp'n at 20.  Any assertion that Ms. Bruner ordered Ms. Coyner to keep working when

she knew that Ms. Coyner was beyond the 24 credit hour limit should be stricken under the sham

affidavit rule.  Ms. Coyner was on a gliding flexitour schedule and was expected to manage her

schedule and work within the credit hours that could be accrued.  Appx133-134, Appx159-161.

On occasions when Ms. Coyner worked outside of her standard tour of duty, she earned credit

hours and could and did use these credit hours to later take leave, as permitted by statute.  *See*

Appx17-45.

17.     That Ms. Coyner pushed back against her supervisors and Mr. Kilmer and

demanded further explanations of a clear direction does not create a genuine issue with respect to

the material fact that the agency did not order or approve her to work overtime, including

through inducement.

18.     Same as paragraph 17.  Additionally, Ms. Coyner appears to argue that neither Ms. Bruner nor Mr. Kilmer had full knowledge of the extent of her job responsibilities, so it is unclear how she expected them to tell her specifically what work to delegate.  *See* Pl. Opp'n at 12, 13, 33.

19.     Ms. Coyner was well aware of her tour of duty hours and the rules for being on a gliding flexitour schedule with credit hours, including not carrying over more than 24 credit hours per pay period.  *See* Appx1-2.  As discussed in section I., Ms. Coyner's suggestions that "just don't work," "don't work over 24 hours," "just stop working," and "you're at your 24 hours. Stop." meant the exact opposite are completely unsupported.  Appx111-113.  The claim that Ms. Coyner was "expressly requested" to perform work after she informed her supervisors that she had already accrued 24 credit hours per pay period should be stricken under the sham affidavit rule.  *See* Pl. Opp'n at 21.  Furthermore, Ms. Coyner was free to manage her schedule and reduce her balance of credit hours by being absent from work using credit hours, and thus presents no evidence that her supervisor knew that she would end up over the 24 credit hour limit when she was given assignments.

**III.    Ms. Coyner's Contention That She Is Entitled To Overtime Because Her Credit Hours Were "Marked Improperly" And She Worked Involuntarily Is Contrary To Statute And Case Law**

In our motion, we demonstrated that the Court should award the Government summary judgment on any portion of Ms. Coyner's claimed overtime hours that she actually accrued in credit hours because employees cannot be paid for such hours as a matter of law.  We established that Ms. Coyner attempts to evade the statutory requirements of the Federal Employees Flexible and Compressed Work Schedules Act of 1982, 5 U.S.C. §§ 6120-6133.  Section 6122(a) of title 5 of the United States Code allows agencies to establish flexible schedules for their employees,

including permitting employees to choose the time of their arrival and departure for the purpose

of "accumulating credit hours to reduce the length of the workweek or another workday."  5

U.S.C. § 6122(a)(2).  Section 6123(b) of title 5 of the United States Code states:

> Notwithstanding the provisions of law referred to in subsection
> (a)(1) of this section, an employee *shall not be entitled to be
> compensated for credit hours worked* except to the extent
> authorized under section 6126 of this title or to the extent such
> employee is allowed to have such hours taken into account with
> respect to the employee's basic work requirement.

5 U.S.C. § 6123(b) (emphasis added).  The provisions of law referred to in subsection (a)(1), as

referenced in subsection (b), specifically include 38 U.S.C. § 7453(e) (the statute under which

Ms. Coyner claims overtime), along with the Federal Employee Pay Act (FEPA) (5 U.S.C.

5542(a)) and the Fair Labor Standards Act (FLSA).  *See id.* at § 6123(a)(1).

     Because credit hours plainly cannot be compensated, either with basic pay or overtime,

Ms. Coyner takes the position that the hours she worked should not be considered credit hours

and that the credit hours in her timekeeping records were simply "improperly marked" by the

agency and must be converted to overtime.  *See* Pl. Opp'n at 22-25.  There are several

overlapping reasons why this argument must fail.

### A.  Ms. Coyner Does Not Correctly Apply This Court's Cases

First, Ms. Coyner misreads *Abbey v. United States*, 124 Fed. Cl. 397 (2015) to assert that

there is a method by which a court, based on the testimony of an employee, can determine that an

agency "improperly marked" true overtime as credit hours.  *See* Pl. Opp'n at 22.  *Abbey*

addressed overtime claims of air traffic controllers employed by the Federal Aviation

Administration (FAA) for hours worked beyond their basic work requirement.  124 Fed. Cl. 397,

399 (2015).  It was undisputed that the work was performed with the FAA's knowledge and

authorization.  *Id.*  The question before the Court was "whether the FAA's compensatory time

19

and credit hour programs were legally permissible either in whole or in part and if not, whether the FAA is liable for overtime for excess hours." *Id.*

The Court ultimately concluded that for certain time periods, the FAA's credit hour program exceeded the authority of the Federal Employees Flexible and Compressed Work Schedules Act because it allowed for unlimited credit hour accrual, which ignored the statutory 24 credit hour per pay period cap, and required employees to forfeit unused credit hours, instead of receiving reimbursed per the statute when they left their positions. *Id.* at 403-05. The Court determined that "the credit hours accumulated by the controllers in excess of the twenty-four hour cap for credit hours under the Flexible Schedules Act cannot continue to be characterized as credit hours when the FAA's treatment of such hours did not comport with the requirements of 5 U.S.C. § 6126." *Id.* at 406. Therefore, because FLSA exemptions must be narrowly construed against employers, the Court held that the accrued credit hours beyond the 24 credit hour per pay period limit must be treated as FLSA overtime hours. *Id.* at 406-07.

Ms. Coyner's argument that *Abbey* allows the Court to simply decide that her credit hours were "improperly marked" and hence must be paid as overtime pursuant to 38 U.S.C. § 7453(e) is erroneous. Ms. Coyner does not claim that she, or anyone else, was permitted to accrue credit hours beyond the 24 credit hour per pay period limit; to the contrary, she claims just the opposite. Nor does she claim that the agency otherwise created a credit hour program that does not comply with the law. Because Ms. Coyner's credit hours were accrued pursuant to the statutory requirements for a credit hours program, *Abbey* does not provide a basis for the Court to convert the credit hours into compensable overtime, contrary to the clear mandate of 5 U.S.C. § 6123(b). Indeed, the *Abbey* Court only treated credit hours accrued by the controllers *in excess* of the 24 credit hour per pay period cap as FLSA overtime, not any and all credit hours, as Ms.

Coyner suggests.  *See* Pl. Opp'n at 22.  Finally, *Abbey* did not address subjective claims of individual employees about the nature of their jobs or the importance or necessity of the work they were performing.  Nor did the Court  provide any determination that otherwise statutorily valid credit hours were "improperly marked" in some way.

> **B.     Ms. Coyner's Arguments About Voluntary Credit Hours Are Contrary To Statute And Case Law**

Ms. Coyner's next attempts to contest that credit hours cannot, as a matter of law, be compensated either with basic pay or overtime by arguing that her hours did not meet the definition of credit hours in 5 U.S.C. § 6121(4).  This statute defines credit hours as "any hours, within a flexible schedule established under section 6122 of this title, which are in excess of an employee's basic work requirement and which the employee elects to work so as to vary the length of a workweek or a workday[.]  5 U.S.C. § 6121(4).  Ms. Coyner argues that, because, due to the demands of her job, she did not "elect" to work credit hours voluntarily, the time she accrued as credit hours cannot be counted as credit hours.  Pl. Opp'n at 23.  Ms. Coyner goes so far as to assert that *any* work done "by request of a superior, or that is required in order to complete assignments, to meet deadlines, for an Agency to meet its metrics, or to any other necessity other than solely at the election of the employee so as to vary the length of a workweek or workday" cannot be defined as credit hours because it is not voluntary.  *Id.* at 23-24.

Ms. Coyner's argument is unsound and is not supported by statute or the case law that she cites.  Ms. Coyner proposes that, for an employee to earn credit hours that can be used later as a form of leave to reduce the length of a workweek or workday, as indicated in 5 U.S.C. § 6122(a)(2), the employee can only be doing something unsolicited, unimportant, and totally unnecessary.  Pl. Opp'n at 23-24.  However, a flexible schedule with credit hours is a benefit that allows an employee to stay late one night, for example, for three hours, and then take off on

another day for three hours without penalty or having to request annual leave.  Inherent in this idea is that the employee is actually doing useful work to earn credit hours, including work that is expected by a supervisor.  Ms. Coyner would apparently have this same employee sit in his office doing nothing for three hours just because he feels like varying his schedule and still accumulate credit hours – indeed, that seems to be the only way in Ms. Coyner's argument that an employee *could* earn credit hours.  There is plainly no basis in the statute for this idea and it runs counter to the functioning of an effective workplace.

Ms. Coyner's reliance on the word "elect" in the definition of credit hours in 5 U.S.C. § 6121(4) is also defective.  While Ms. Coyner argues that she was not "electing" to do the work itself, she did elect the times and days when she determined that she needed to work credit hours, and, conversely, elected when she used her credit hours to be absent from work.  Hence, she was choosing these hours to vary the length of her workweek or workday, as set forth in 5 U.S.C. § 6121(4).  The definition of credit hours does not speak to whether the employee is choosing voluntarily to do a *particular task*, or whether it is being required by a supervisor or even just a performance metric, but instead discusses the process of an employee choosing to set her own timetable of work.

Similarly, pursuant to 5 U.S.C. § 6121(6), "overtime" means "all hours in excess of 8 hours in a day or 40 hours in a week which are officially ordered in advance, but does not include credit hours[.]"  5 U.S.C. § 6121(6).  This also speaks to the manner in which hours are assigned.  Ms. Coyner makes some attempt to argue that all of her credit hours were "officially approved" by Ms. Bruner, but cannot conform to the actual definitional requirement that overtime be "officially ordered in advance."[13]  *See* Pl. Opp'n at 22-23, n.5.  Ms. Coyner does not

---

[13] Ms. Coyner does not address the period of time that she was supervised by Ms. Lohar or

proffer any emails or testimony evidencing any verbal directions in which Ms. Bruner ordered her in advance to work a specific amount of hours beyond her tour of duty on any specific day. Instead, Ms. Coyner herself "marked" time as credit hours in her spreadsheet, decided how much to work each day and when to arrive and depart, and provided this information to Ms. Bruner and the timekeeper.  SAppx33-54, SAppx7, 9, 12.  Ms. Coyner informed Ms. Bruner that she could not tell Ms. Bruner in advance when she would work credit hours.  SAppx17.  Therefore, as a matter of law, because Ms. Coyner's credit hours were accrued as part of a valid flexible schedule program and were used to vary the length of her workweek or workday of her own accord without being ordered in advance, they were indeed credit hours and cannot be compensated with either basic pay or overtime.[14]

Furthermore, contrary to Ms. Coyner's contentions, the cases discussing these basic

---

Mr. Schulz and hence incorrectly argues that "all" of her credit hours were approved by Ms. Bruner.  *See* Pl. Opp'n at 22-23, n.5.  Additionally, Ms. Coyner does not provide legal support for the proposition that all of her credit hours were "officially ordered or approved" overtime within the meaning of 38 U.S.C. § 7453(e) simply because Ms. Bruner generally gave blanket approval for Ms. Coyner to work up to 24 credit hours per pay period.  SAppx31.  Furthermore, Ms. Bruner explained that, although Ms. Coyner could work up to 24 credit hours per pay period, Ms. Coyner would determine those specific hours and Ms. Bruner would only approve individual credit hours after the fact.  *Id.*  This does not present a genuine issue of material fact that Ms. Bruner was ordering, approving, or inducing *overtime*.

[14]  The guidance from the Office of Personnel Management (OPM) cited by Ms. Coyner does not alter this conclusion.  *See* Pl. Opp'n at 23.  OPM draws the same distinction as the statutory definitions – work that is regularly scheduled, ordered, or required in a set period like travel or training is not credit hours because credit hours are worked voluntarily by employees beyond their basic work requirement.  Ms. Coyner simply has a different definition of "voluntary."  She asserts that any work that is prompted by a supervisor's request, a deadline, a metric, or any other sort of pressure is not "voluntary."  Indeed, most people do not work "voluntarily" in the sense that they complete their job duties because of overarching job requirements and consequences.  However, neither the statute nor the OPM guidance provide that only unnecessary work that an employee is choosing to do without any outside prompting is suitable for credit hours.  Instead, the distinction in the law between overtime and credit hours is whether an employee chooses his own schedule beyond his basic work requirement or is ordered or scheduled to work extra hours.

statutory definitions do not provide a method of converting credit hours to overtime or a means

for the Court to investigate whether credit hours were earned for tasks freely undertaken by an

employee, as opposed to prompted by a supervisor's request, a metric, a deadline, or some other

job-related necessity.  Simply put, "[i]f an employee receives credit hours for work in excess of

40 hours in a workweek, those hours are, by statutory definition, not considered overtime hours."

*Doe v. United States*, 513 F.3d 1348, 1351 (Fed. Cir. 2008).  Indeed, "5 U.S.C. § 6121(6)

specifically states that credit hours are not to be considered overtime hours."  *Id.* at 1357.  The

Federal Circuit has been clear that employees are "generally not entitled to compensation for

credit hours" and that "[t]he only instance in which an agency may provide monetary

compensation for credit hours is when an employee ends participation in a flexible work

schedule program."  *Id.* (citing 5 U.S.C. § 6122(a) and 5 U.S.C. § 6126(b)).  "[C]redit hours are

distinguished from overtime hours in that credit hours *are not officially ordered in advance by

management*, but are voluntary on behalf of the employee."  *Abbey*, 124 Fed. Cl. at 402

(emphasis added).  These cases and the statutes do not describe a third category of compensable

hours that are not credit hours, but are also not overtime ordered in advance.  Ms. Coyner's time

was thus credit hours.

Ms. Coyner also incorrectly describes the Court's holding in *Whalen v. United States*, 93

Fed. Cl. 579, 597 (2010).  The Court did not hold, as Ms. Coyner asserts, that "credit hours

marked by the defendant were proper because the extra hours were initiated and voluntarily

opted to be worked by the employees."  Pl. Opp'n at 23.  Ms. Coyner's assertion suggests that

the *Whalen* Court engaged in an analysis of whether employees voluntarily designated their time

as credit hours.  Instead, like *Abbey*, the case centered on whether the FAA actually possessed

authority to invoke title 5 to create a credit hour program.  *Whalen v. United States*, 93 Fed. Cl.

24

579, 589-97 (2010)  The Court concluded that the FAA possessed such authority and that the

agency could properly include credit hours in its personnel management system.  *Id.* at 597.

Thus, the Court held that "the credit hours plaintiffs worked are not FLSA overtime hours, and

plaintiffs are not entitled to overtime compensation for those hours."  *Id.*

      *Doe*, *Abbey*, and *Whalen* do not provide a basis for a court to analyze subjective feelings

of voluntariness or find that an employee did not "elect" to work credit hours because she felt

pressure from the importance of the work or upcoming deadlines.  Instead, the cases draw a

distinction between overtime and credit hours for employees on flexible schedules and establish

that, if hours do not meet the definition of overtime because they are not ordered in advance,

they are credit hours.  As we explained in our motion, Ms. Coyner's time records demonstrate

that she earned 360.75 credit hours.  Def. Mot. at 12.  Because Ms. Coyner cannot, as a matter of

law, be compensated for this time, the Court should grant summary judgment on all hours that

Ms. Coyner earned as credit hours.

## IV.    Ms. Coyner Incorrectly Contends That Overtime Is Induced Pursuant To 38 U.S.C. § 7453(e) When An Employee Is "Knowingly" Placed In A Position With Duties That Cannot Be Completed Without Working Extra Hours

      In our motion, we demonstrated that there was no genuine issue with respect to the

material fact that Ms. Coyner was not officially ordered or approved to work any hours over and

above the 24-credit hour limit, including through inducement.  *Id.* at 13-16.  Ms. Coyner

contends that inducement "includes situations in which an employee is knowingly placed in a

position with duties that cannot be completed without working extra hours."  Pl. Opp'n at 24.

This assertion contradicts the other arguments in Ms. Coyner's own opposition and is not

supported by precedent in any event.[15]

_____

    [15]  Throughout this section, Ms. Coyner uses the term "extra hours" both to refer to all hours

A.    **The Cases Ms. Coyner Relies Upon Are Distinguishable**

Ms. Coyner's legal analysis must fail.  Ms. Coyner primarily relies on *Anderson v.*

*United States*, 136 Ct. Cl. 365 (1956), which she claims stands for the proposition that overtime

is induced by an agency when employees are "knowingly placed in a position with duties that

could not feasibly be completed without working extra hours," even when the employees were

told there were no consequences for not working extra hours.  *Id.* at 26.  As we discussed in our

motion, cases finding inducement generally involved law enforcement-type employees who were

specifically told that their job duties inherently required them to work unpaid overtime.

*Anderson* is one of these cases and is clearly distinguishable from the instant case.

First, the most obvious difference is the nature of the work.  While Ms. Coyner's job was

undoubtedly important, it involved overseeing the coordination of care for veterans outside of the

Department of Veterans Affairs system, such as through meeting with vendors, and was

conducted in an office environment.  It did not involve work akin to detecting and pursuing

smugglers, which "could not be stopped at 5:00 o'clock and resumed at 8:00 the next morning."

*Anderson v. United States*, 136 Ct. Cl. 365, 367 (1956).  The *Anderson* decision sets forth the job

description of the Customs Patrol Officers, including patrolling large areas, inspections,

surveillance, pursuit, working with informants and locals, and generally preventing smuggling

through the "frequent appearance and presence of patrol officers at various places throughout

their stations, and at varying and odd hours of the day and night."  *Id.* at 374-77.

Second, Ms. Coyner errs in stating that the employees in *Anderson* were "not directed

_____

that she worked above eight hours per day and 40 hours per week as well as only hours beyond
the 24 credit our per pay period limit.  It is unclear whether Ms. Coyner is arguing that she is
entitled to overtime pursuant to 38 U.S.C. § 7453(e) for all hours beyond her standard tour of
duty, without reference to whether some hours were earned as credit hours, or only for any
additional hours that she worked beyond the 24 credit hour per pay period limit.

that their job required them to work extra hours" – in fact, the opposite occurred.  *See* Pl. Opp'n

at 26.  At the end of World War II, the officers were placed on a 40-hour work week, but the

agency repeatedly exhorted and encouraged the officers to work beyond a standard eight-hour

schedule and impressed upon them that this was needed for their mission to be accomplished.

*Anderson*, 136 Ct. Cl. at 385-87.  For example, the officers were told to perform their duties

within eight hours *without* overtime, but that "[t]here will be no objection whatsoever to the

performance of regularly assigned duties on a voluntary basis," although officers were told that

they would not be held accountable "for failure" to work more than 40 hours in a week.  *Id.* at

387-90.  The agency also developed a policy of "voluntary overtime" and the officers continued

to work as they had before the institution of the 40-hour work week, but without overtime,

although everyone now simply filled out their timesheets and other forms to reflect the official

eight-hour duty requirement.  *Id.* at 392-93.

The Court therefore noted in *Anderson* that, contrary to ostensible communications that

an officer's basic workweek was 40 hours and no one would be penalized for working less than

40 hours, "every administrative device and the tone and content of instructions were so cast as to

imply (if not overtly to state) the opposite."  *Id.* at 393.  There were "clear indications and

implications of the desires of [an officer's] administrative superiors" bearing on any officer who

would choose not to work more than 40 hours per week.  *Id.*  Those circumstances are very

different from what Ms. Coyner faced.  *See* Pl. Opp'n at 30.

Unlike the customs officers, Ms. Coyner was not merely told that she would not be

penalized *if* she stopped working, while at the same time also being given clear encouragement

to work excessively for the good of the department.  Instead, she was repeatedly and explicitly

told to *actually stop working* once she reached her 24 credit hour per pay period limit.  Contrary

to *Anderson*, the fact that she did not stop working was considered problematic and undesirable by Ms. Bruner and Mr. Kilmer.  *See* Appx68, Appx134-141.  Again, while Ms. Coyner asserts that she needed to keep working or else dire consequences would ensue, there is no evidence that this attitude was imposed upon her by her management.

Ms. Coyner also focuses on how the agency in *Anderson* did not tell employees how their work could be acceptably completed without working extra hours.  *See* Pl. Opp'n at 26-27.  The Court noted that the agency did not "indicate or even to suggest" how an officer could complete his work within a 40-hour workweek if he wanted to take the agency's claim that no one would be penalized for not working beyond this tour of duty at face value, thus further demonstrating that this suggestion was not genuine.  *Anderson*, 136 Ct. Cl. at 393.  By contrast, Ms. Coyner, despite being a senior management official, argues that she needed to be given some further explanation of how to literally stop working.  Clearly, unlike a customs patrol officer who might need to apprehend a criminal in the middle of the night, Ms. Coyner could turn off her computer, leave her office, and go home.

Therefore, Ms. Coyner is wrong to rely on *Anderson* to argue that placing "employees in a position with duties that could not feasibly be fulfilled within regular hours" is inducement. *See* Pl. Opp'n at 24.  The *Anderson* Court based its holding on the communications to officers rationalizing the concept of "voluntary overtime" and inducing the officers to work beyond a 40-hour workweek by implying that such work was part of being an exemplary officer.  None of these facts are present in this case.

Ms. Coyner also relies on *Manning v. United States*, 10 Cl. Ct. 651 (1986).  Pl. Opp'n at 27.  Like *Anderson*, this case is distinguishable.  In *Manning*, the plaintiff, a civilian employee in the Department of the Navy (Navy), was employed as Special Services Director at a naval air

station. *Manning v. United States*, 10 Cl. Ct. 651, 652 (1986). He was in charge of the planning and operation of a recreational program and facilities for a large number of people. *Id.* The Navy reduced his staff, but it increased the number of hours the facilities were required to be open and assigned many more responsibilities to his department. *Id.*

In *Manning*, the plaintiff recorded all of his overtime hours and submitted them to his command, which at first authorized and paid this overtime. But later, the plaintiff's supervisor told him that they needed his work but could not afford to pay overtime and that he would be placed on standby duty status for 28 additional hours a week. Standby duty status would entitle him to a 25% pay increase, although not the one and a half times his normal rate that he would receive if paid overtime. *Id.* at 653, 660-63.

The Court found that the plaintiff was not actually on standby duty according to the statutory and regulatory definition for this type of premium pay. *Id.* at 659-60. Instead, he continued to perform his regular work and his command knew that he was actually working during the 28 hours he was allegedly on standby. *Id.* at 662-64. The Court therefore found that he was induced to work overtime because he had a substantial amount of work to complete, his supervisor told him that they needed the overtime work but could not afford to pay him, and the plaintiff told his supervisor that he would actually be working instead of merely standing by. *Id.* at 663-64. The agency could not set up an improper standby status arrangement as a subterfuge to avoid paying for overtime. *Id.* at 664.

*Manning* does not stand for the proposition that any job position where an employee is very busy automatically entitles an employee to overtime. Indeed, the Court acknowledged that, if the plaintiff could not demonstrate that he was authorized to perform overtime work, he would be considered a volunteer. *Id.* at 661. Ms. Coyner presents absolutely no evidence that her

supervisors, like those in *Manning*, "withheld official approval for overtime."  *See* Pl. Opp'n at

31.  *Manning* also does not suggest that an employee is entitled to overtime if he thinks it was

"unreasonable" for his supervisors not to approve overtime.  *Id.*  In *Manning*, the plaintiff's

hours should have been issued as overtime because they were approved and understood to be

overtime but were only given as standby time.  Like *Anderson* and the other cases we rely upon,

*Manning* involves an agency acknowledging, approving, and encouraging or requiring overtime

work.

Finally, Ms. Coyner references *Abbott v. United States*, No. 317-71, 1980 U.S. Ct. Cl.

LEXIS 1066.  *See id.* at 27.  This case also does not involve plaintiffs who were "knowingly put

in a position with duties they could not complete without working extra hours," as Ms. Coyner

contends.  *Id.*  Instead, the plaintiffs were air safety investigators tasked with traveling to aviation

accident scenes as expeditiously as possible.  *Abbott v. United States*, No. 317-71, 1980 U.S. Ct.

Cl. LEXIS 1006, at *6 (Ct. Cl. May 30, 1980).  Given that they had to leave their normal

location extremely quickly, the plaintiffs would use their travel time to prepare for the

investigation and complete work required by their employment manual.  *Id.* at *11-*13.

The Court concluded that because there was more than a tacit expectation that work

would be performed while traveling under emergent conditions, it was induced and compensable

as overtime.  *Id.* at *18-*19.  "Here, the time pressure involved and the emergent nature of the

travel demanded that plaintiffs utilize their travel periods for the performance of work which was

necessarily, primarily, and predominantly for their employer's benefit."  *Id.* at *18.  However,

the Court denied compensation for work performed during travel that was not the initial or final

trip to an accident site.  The Court noted that there was "no explanation why the work could not

have been done at the work site or at plaintiffs' motels or residences" and thus the plaintiffs were

not owed overtime for this travel time.

Therefore, the *Abbott* plaintiffs were unique in that they were required to prepare for an investigation on short notice after receiving a summons to depart for an accident site as expeditiously as possible.  In ruling that the *Abbott* plaintiffs were entitled to overtime, the Court did not create a rule requiring payment of overtime to any employee claiming that he or she cannot complete work during the course of their normal tour of duty.  *See* Pl. Opp'n at 26. Furthermore, *Abbott* is unlike this case because it did not involve an employee who was specifically directed to stop working. [16]

### B.   Ms. Coyner Ignores Key Precedent Defining Inducement

Notably, other than claiming that *Anderson* assists her case, Ms. Coyner does not attempt to address any of the cases cited in our motion.  Ms. Coyner's argument that inducement consists of an employee being "placed in a position with duties that cannot be completed without extra hours worked" also ignores precedent recognizing that employers do not induce overtime by mere knowledge or passive expectations.  The Court of Claims has held that the FEPA does not require compensation when the employer only has "mere knowledge" of the overtime.  *See*

---

[16]  Ms. Coyner also mentions the Court of Federal Claims' decision in *Mercier v. United States*, 114 Fed. Cl. 795, 802 (2014) (*Mercier I*), which was reversed in *Mercier v. United States*, 786 F.3d 971 (Fed. Cir. 2015) (*Mercier II*).  Pl. Opp'n at 25.  In *Mercier I*, addressing a motion to dismiss, the Court stated that, *if proven true*, the nurses' allegations would likely suffice to establish  inducement.  *Mercier I*, 114 Fed. Cl. at 801.  However, contrary to what Ms. Coyner suggests in her opposition, the Court never made any findings of fact on the nurses' claims.  Ms. Coyner also does not correctly state the Court's description of the allegations – the nurses in *Mercier I* were required to respond to alerts "that could come at any time of the day or night" and nurses who did not timely respond to these alerts "were subject to intensified scrutiny and possible disciplinary action . . . ."  *Id.* This is not the same as merely a "potential for negative consequences," as alleged by Ms. Coyner.  *See* Pl. Opp'n at 25-26.  Ms. Coyner did not testify that she was ever told that she would face any kind of employment repercussions if she did not complete her work.  Instead, she relies on the generalized potential for bad outcomes or lower metrics.  Finally, Ms. Coyner acknowledges that she was specifically told by Ms. Bruner to stop working when she reached 24 credit hours per pay period.

*Bilello v. United States*, 174 Ct. Cl. 1253, 1257 (1966).  This statement alone defeats Ms. Coyner's argument that knowledge that a position requires a high level of effort constitutes inducement.

Furthermore, contrary to Ms. Coyner's contention that no affirmative action or encouragement on the part of an employer is necessary, *Bilello* clearly states that an employer must have "actively induced and encouraged the overtime." *Id.*  As Ms. Coyner appears to acknowledge, Pl. Opp'n at 28, a "tacit expectation" that is not a "tacit approval" to work overtime is not compensable.  *See Albright v. United States*, 161 Ct. Cl. 356, 361 (1963); *Baylor v. United States*, 198 Ct. Cl. 331, 359-60 (1972).

Finally, Ms. Coyner ignores the Court of Claims's determination, in *Bantom v. United States*, that when an employee's "early arrival was not occasioned by any requirement or order, but rather was voluntary" on the part of the employee based on his "own personal preference," there was no inducement and the agency did not owe overtime compensation.  165 Ct. Cl. 312, 318 (1964).  Although *Bantom* dealt with smaller amounts of time per day than occurred here, other than stating in a conclusory manner that she did not work voluntarily, Ms. Coyner does not point to any requirement or directive that she was required to work other than her normal tour of duty on any particular day.  Ms. Coyner's personal motivations and opinions about how much work was required cannot by themselves entitle her to overtime without some action on the part of her supervisors.  Thus, Ms. Coyner's arguments are flatly contradicted by the cases that she relies upon.

**C.    Ms. Coyner's Suggested Knowledge Test Would Not Apply Here**

Finally, there are several logistical and factual problems with Ms. Coyner's legal position.  Although Ms. Coyner argues that she was "knowingly" put in a position with duties

32

"that could not feasibly be completed without working extra hours," Pl. Opp'n at 24, Ms. Coyner

also argues that neither her supervisors nor Mr. Kilmer "were aware of the full extent of her

duties." *Id.* at 12, 13, 33.  According to Ms. Coyner, Ms. Lohar, Ms. Bruner, and Mr. Kilmer

were unaware of all the problems in the department that she was required to address.  *Id.* at 15.

Importantly, the record also demonstrates that Ms. Coyner was not informing Ms. Bruner of all

the hours she was working.  SAppx7.  Thus, even if Ms. Coyner was correctly stating the

standard for inducement, which she is not, she appears to concede that she was not "knowingly"

being given an excessive amount of work because no one knew what her duties were at any

given time and how many hours she was devoting to these duties.

Furthermore, although Ms. Coyner's affidavit states that it was "impossible" to work only

her standard tour of duty, and that her work "inherently necessitated" working outside of regular

hours, she presents absolutely no evidence that anyone else agreed with this assessment, which

should be a necessary fact if she seeks to create a standard for inducement based on the

knowledge of supervisors about the level of work in a given position.  *See* SAppx2-3.  At most,

Ms. Coyner subjectively believed that she needed to work long hours due to her workload,

deadlines, and the importance of her job, and that she could disregard management's

admonitions to stop working.  Her testimony is bereft of any evidence as to the knowledge of

those she alleges placed her in that position and gave her those duties.  To the contrary, the

record indisputably shows that Ms. Bruner did not agree that Ms. Coyner's hours were necessary

and told her to stop working beyond 24 credit hours per pay period.  Thus, even under Ms.

Coyner's own suggested standard, there is no genuine issue of material fact that she was not

induced to work overtime.

Therefore, there is no genuine issue of material fact on this issue.  The undisputed

evidence demonstrates that Ms. Coyner was not "officially ordered or approved" to work overtime, including through inducement, as required for her to recover under 38 U.S.C. § 7453(e).  Accordingly, the Government is entitled to judgment as a matter of law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant our motion and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL:

Robert C. "Rob" Burlison III, Esq.
Senior Trial Attorney
Department of Veterans Affairs
Continental District
(AR, CO, LA, MS, MT, OK, TX, UT, WY)
P.O. Box 25126
Denver, CO 80225
Tel: (202) 674-2212

/s/ Rebecca S. Kruser
REBECCA S. KRUSER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 305-2035
rebecca.s.kruser@usdoj.gov

August 17, 2022

Attorneys for Defendant